RENICK *v.* LUDINGTON *et al.*

Decided December 14, 1878.

14 367
46 468
14 367
60 22

1. As between the judgment creditor and debtor the statute requiring the judgment to be docketed has no application or force.

1878
Special Term.

2. Section 5 of chapter 139 of the Code gives a positive express lien of a judgment against all the lands, of or to which the debtor shall be possessed or entitled at or after the date of such judgment, or if it was rendered in court, at or after the commencement of the term, at which it was so rendered; and such lien continues until it is in some legal manner discharged.

3. Where various judgments are rendered against a debtor, and the junior judgments are docketed, and the senior undocketed, and in this state of things the debtor conveys a part of the land to a purchaser for valuable consideration without notice of the undocketed judgments, and the docketed judgment liens are not discharged, the liens of the undocketed judgments must be discharged out of the proceeds of the unsold lands, although the effect might be to require the holders of the docketed judgments to resort in whole or in part to the land so conveyed for satisfaction of their judgment liens.

4. Section 7 of chapter 139 was enacted for the protection of purchasers for valuable consideration without notice of judgments; but that protection only extends to the land so conveyed to such purchaser, it being liable to the satisfaction of judgments docketed according to law and to such judgments only.

5. A judgment is recovered, and an execution issued thereon, and while it is in the hands of the sheriff, an agreement is made between the creditor and debtor, by which certain claims are

transferred to the creditor in satisfaction of the judgment, and thereupon the sheriff, at the instance of the creditor, returns the execution "satisfied," but it appears, that said agreement on the part of the debtor was fraudulent and the execution was not in fact satisfied, the lien of the judgment is not destroyed, and its position and priority is not disturbed, although its payment may affect purchasers of part of the land of the debtor, where it does not appear in the pleadings and proofs, that such return was brought home to the purchaser, and by it he was misled to his injury.

6. A creditor, in order to preserve his rights against a surety, is not bound to active diligence, and if he merely remain passive, his rights are not thereby impaired.

7. But if he does not remain passive, but attempts to collect the debt, and compromises the same, and by such compromise puts it out of the power of the surety, against whom he subsequently proceeds, to be subrogated to the rights of the creditor and reimburse himself if he paid the debt, the right of the creditor to proceed against the surety is by such act destroyed.

Appeal from certain decrees of the circuit court of Greenbrier county, pronounced, one on the 21st day of June, 1876, and two on the 25th day of June, 1877, in a cause in said court then pending, wherein B. F. Renick was plaintiff and S. C. Ludington and others were defendants, allowed on the petition of the said defendants.

Hon. Homer A. Holt, judge of the eighth judicial circuit, pronounced the decrees appealed from.

JOHNSON, JUDGE, furnishes the following statement of the case:

B. F. Renick in September, 1874, instituted a chancery suit in the circuit court of Greenbrier county, against S. C. Ludington and others, to subject the lands of said Ludington to the payment of his and other judgment liens. The cause was referred to a commissioner and the liens audited.

The record shows that part of the appellants were purchasers of tracts of land of said S. C. Ludington. At the time of the purchase of said tracts of land there

1878
Special Term.

Renick
v.
Ludington et al.

were a number of judgments against said Ludington. Some were docketed, and others undocketed. The purchasers claimed, that the judgment creditors, who had failed to docket their judgments, had lost their liens entirely, provided their enforcement would require those that were docketed to be satisfied out of the lands they had purchased.

The bill attacked as fraudulent a conveyance of a tract of four hundred and fifty acres of land by S. C. Ludington to a trustee for the benefit of Mrs. Ludington, the wife of S. C. Ludington. The answer of Mrs. Ludington was filed, denying the fraud, &c. Proofs were taken and the court decreed, that said deed was valid; but afterwards the land conveyed to her by said deed was sold by a commissioner in this suit; and Mrs. Ludington became the purchaser, and paid so much of the purchase money as was required to be paid, and gave her bond with security for the residue. The sale was confirmed, and the court declared in a subsequent decree, that Mrs. Ludington had refused to accept the provisions of the deed to her trustee for her benefit, and had bought the land at the commissioner's sale; and that said lands must be regarded as "unsold" lands, that is, that they had not been sold and conveyed by S. C. Ludington.

It does not appear what induced Mrs. Ludington to consent that the lands should be sold by the commissioner. There was no exception to the report of sale by any one.

Michael Fleshman filed his petition in the cause, which he prayed might be taken as an answer to the bill and which was so treated, in which he set up his judgment against said Ludington, and showed that an execution thereon had been by his direction returned satisfied, but that it had been done through the fraud of said S. C. Ludington; that said Ludington had given him an order on certain parties, and transferred certain stock in a turnpike company; that he represented to him that he owned the stock, and that the order was good; but that

the representations were false, that the order was worthless, and that he did not own the stock, and could make no transfer of it. No special replication was made to the answer.

Many depositions were taken upon the question of the fraudulent inducement to order the execution to be returned satisfied, among which was the deposition of the defendant, S. C. Ludington. The evidence clearly showed that the defendant, Ludington, was guilty of fraud in the agreement made with Fleshman, by which he was induced to order the execution returned satisfied. The court decreed. that the return should be set aside, and gave the judgment of the said Fleshman its place as a lien which was not docketed against the "unsold" lands of said Ludington. The circumstances, under which the court decreed that said Ludington should pay to Joel McPherson *one-fourth* of the judgment he had recovered against John E. Lewis, a defaulting sheriff of Greenbrier county, and his sureties, are sufficiently set out in the opinion of the court.

The court decreed, that the undocketed judgments should be paid in the order of their priorities, out of the lands of the debtor unsold, and that the docketed judgments in the order of their being docketed, after the unsold land had been exhausted, should revert to the "sold" lands in the order of their sales, taking those last sold first, and so on.

From the decrees entered in the cause on the 21st of June, 1876, and the 25th of June, 1877, an appeal was granted.

*A. C. Snyder*, for appellants, cited the following authorities:

Code, ch. 139, §§5,7, 8, 9 ; 2 Gratt. 182 ; 26 Gratt. 81 ; 1 Story's Eq. Jur. §§64, c., 381, 434 ; 24 Gratt. 313 ; *Id.* 241; 9 Gratt. 27 ; 2 Bibb 40 ; Stat. Westm. 2, 13 Edward I. ch. 18 ; 1 R. Code, ch. 134, §1 ; 28 Gratt. 423 ; 4 Pet. 124 ; 1 Story's Eq. Jur. §416 ; 2 Story's Eq. Jur.

§§1502, 1503, b. and n. 1; Va. Law Journ. (May 1877,) $\underset{\text{Special Term.}}{1878}$
p. 266; 1 T. R. 12, 16; 1 Story's Eq, Jur. §§105, 109; $\overline{\text{Renick}}$
1 Salk. 289; Story's Agency §127; 20 Iowa 373; 2 $\underset{\text{Ludington } et\ al.}{\text{v.}}$
Watts 459; 22 Ill. 484; 5 Md. 281; 17 Ohio St. 635;
3 Ind. 327; 22 Md. 94; 12 Md. 144; 24 Ala. 439; 20
Ala. 662; 7 Cow. 434; 14 La. Ann. 56; 18 Wis. 575;
40 Ga. 56; 10 Gratt. 173; 64 N. Y. 294; 21 Am. R.
609, 611; 1 Story's Eq. Jur. §§165, 381, 410; Sp. Ct.
App. Va. L. J. Feb. 1877; 64 N. Y. 397; 21 Am. R.
625; 1 Story's Eq. Jur. §§325, 326, 327; 3 Lead. Ca. Eq.
814, (3d Am. ed. 552.)

*John W. Harris*, for McPherson, appellee, cited the
following authorities:

13 Edward I, ch. 18; 2 Gratt. 44; 28 Gratt. 423;
2 Gratt 419; 1 Lom. Dig. 371 and cases cited; Acts of
Va. 1842-3 ch. 74; Code W. Va., ch. 139, §§7, 9; 2
Leigh 425; 3 Leigh 532; 10 Leigh 394; Rep. Rev.
Code p. 918; 10 Pet. 527; 36 Gratt. 549; 8 N. H. 389;
4 Smed. & M. (Miss.) 169; 7 Smed. & M. (Miss.)
437.

*William P. Rucker*, for M. Fleshman, appellee, cited
the following authorities:

2 Par. Contr. (3d ed.) 271, 272 and notes; 2 Tuck.
Com. 424; Adams Eq. 432; Smith Man. Eq. 68; 2 Lom.
Dig. 296, 299; 3 Leigh 567; 2 Tuck. Com. 421; 6 Munf.
366; 2 Leigh 149; 1 Munf. 518; Gil. 230; Smith Man.
Eq. 64; 2 Lom. Dig. 386, 387; 3 Gratt. 253; 2 Par.
Contr. (3d ed.) 130, 131, 133, 134, 136 and notes;
Smith Man. Law 325; 7 Leigh 346; 6 Leigh 230; 5
Rand. 31; 2 H. & M. 114; 2 Rob. (old) Prac. 310; 2
Tuck. Com. 416; 1 Wash. 145; Adams Eq., side page,
176; Angel Lim. (5th Ed.) 24, 192; 10 W. Va. 662;
*Id*. 321; *Id*. 677, Code Va. 770; Code W. Va. 666, §§5,
7; 2 Rand. 384; 4 Rand. 282; Code, ch. 74, §§1, 2; 1
Rob. 123; *Id* 500; 4 Rand. 309, 314, 315; 1 Rob. 135;

*Id.* 298; Code W. Va. 473; 1 Rand. 217, 327; 1 Tuck. Com. 116, 325, 327; Code W. Va. 474; 2 Call. 198; 4 Rand. 208; 8 Gratt. 148; 2 Lom. Dig. 444, 458; 7 W. Va. 442, 443; Code W. Va., ch. 66, §1; 4 Rand. 314, 315; Bump. 76; *Id.* 92; 3 Gratt. 33; 10 W. Va. 87; 3 Munf. 521; 1 Rob. 123; 3 Gratt. 26; 4 Gratt. 430; 2 Tuck. Com. 442, 443; Code W. Va., ch. 130, §23; 10 W. Va. 59; 1 Par. Contr. (3d ed.) 363, 364, 365; Smith Man. Eq. 47, 48; Adams Eq. 443, 444; 2 Rand. 442; 1 Greenl. Ev. 192 and notes; 2 Lom. Dig. 91; Code W. Va. 549.

JOHNSON, JUDGE, delivered the opinion of the Court:

It is first insisted, that the court erred in its decree, declaring, that the undocketed senior judgments of Fleshman and McPherson should be paid out of the proceeds of the sale of the unsold lands of the defendant, Ludington, to the prejudice of the appellants, who were purchasers of land from said Ludington without notice of said judgments.

The question here presented is: Where a man owns a tract, or several tracts of land, and judgments are recovered against him, and the senior judgments are docketed, and the junior judgments undocketed, and the owner of the lands sells a portion thereof to purchasers for valuable consideration without notice of the judgments, and there is not enough of the unsold land to pay all the judgments, whether the judgment creditors, whose judgments are undocketed, although they are prior in date to the docketed judgments, have by their failure to docket their judgments lost their lien, or shall they be permitted to have their prior judgments satisfied out of the proceeds of the sale of the unsold land, and thus force the creditors, whose judgments have been docketed, on to the sold lands for satisfaction?

The chapter on judgment lien, Code, chap. 139, provides as follows:

*Section* 5. "Every judgment for money rendered in

this State heretofore or hereafter against any person shall be a lien on all the real estate, of or to which such person shall be possessed or entitled, at or after the date of such judgment, or, if it was rendered in court, at or after the commencement of the term, at which it was so rendered ; " with an exception contained in the 6th section which has no application to the cause before us.

*Section* 9. "Where the real estate, liable to the lien of a judgment, is more than sufficient to satisfy the same and it, or any part of it, has been aliened, as between the alienees for value that which was aliened last shall in equity be first liable, and so on with other successive alienations, until the whole judgment is satisfied. And as between alienees, who are volunteers under such judgment debtor, the same rule as to order of liability shall prevail. But any part of such real estate ˈretained by the debtor himself shall be first liable to the satisfaction of the judgment.

*Section* 7. "No judgment shall be a lien on real estate, as against a purchaser thereof for valuable consideration without notice, unless it be docketed according to the 3d and 4th sections of this chapter in the county wherein such real estate is, either, within ninety days next after the date of the judgment, or before a deed therefor to such purchaser is delivered for record to the recorder."

At common law lands of the debtor could not be taken to satisfy his debts, except judgments due to the King, and judgments therefore did not operate as *liens* on land. But by the statute of Westm. 2, 13 Edw. I, ch. 18, substantially adopted in the State of Virginia, 1 Rev. Code, ch. 134, a new execution was provided : the writ of *elegit*, by which a moiety of the lands of the debtor could be subjected to the satisfaction of the judgment. The statute did not in *express* terms give a *lien* on the land. It provided for the writ, and prescribed the form of it. It was by the judicial construction given to this writ, that the judgment was said to be a *lien* on the land. The *lien* resulted

Syllabus 1.

Syllabus 2

Syllabus 8.

Syllabus 4.

from the mandate of the writ, to *deliver* to the creditor by reasonable price and extent a moiety, of all the lands and tenements of the debtor, whereof he was *seized at the date of the judgment, or at any time afterwards.* The *lien* was an incident of the writ, and depended for its existence and continuance upon the capacity to sue out the writ. As long as this capacity lasted, even although revived after being temporarily suspended, the *lien* continued, and whenever it finally ceased, the *lien,* which was dependent upon it, was extinguished.

As the mandate of the writ extended to all lands and tenements, of which the debtor was *seized at the date of the judgment, or at any* time afterwards, it was by force of this mandate also, that the *lien* of the judgment overreached all subsequent conveyances, although made to purchasers for valuable consideration without notice of the judgment, and extended to all the lands of the debtor within the jurisdiction of the State.

In the interest and for the protection of such purchasers the act of March 3, 1843, was passed, which provided for the docketing of judgments, and further, that "no judgment, decree, bond or recognizance thereafter rendered should bind the land of any party to the same against a *bona fide* purchaser for valuable consideration without notice, unless the same should be docketed in the county or corporation, in which the land lay, within twelve months after the rendition, or forfeiture, of such judgment, decree, bond or recognizance, or ninety days before such land shall have been conveyed to such purchaser."

Except as thus modified in respect to purchasers by the Act of 1843 the *lien* of the judgment continued the same in all respects as to its nature, extent, and mode of enforcing it, until the general revision of 1849. Up to that time, as we have seen, it was a mere incident of the writ of *elegit,* resulting by construction from the mandate of the writ, and dependent for its existence and continuance on the capacity to sue out the writ.

It was now made for the first time, as to judgments thereafter to be rendered, an express, direct, positive, absolute *lien* on *all* the *real estate* of, or to which the judgment debtor should be *possessed* or entitled, at or after the date of the judgment, or if it was rendered in court, at or after the commencement of the term at which it was so rendered, with the same qualifications as to purchasers for valuable consideration without notice, as was made by the act of 1843. Code of 1860, chapter 186, §§6 and 8 ; Code of W. Va. ch. 139, §§ 5, 7 and 9.

1878
Special Term.

Renick
v.
Ludington *et al.*

The writ of *elegit* was preserved and made to conform to the *statutory lien* of the judgment ; and an additional remedy in equity was given for the enforcement of the *lien.* Code of 1849, ch. 186, §9 ; Code of 1860, ch. 186, §9 ; Code of W. Va., ch. 139, §8.

The lien of the judgment being now express, positive and in no way dependent upon the *elegit,* and the remedy in equity being preferred in practice, the *elegit* soon fell into disuse, and was finally abolished by the Legislature, Code of W. Va., ch. 140, §2, and was abolished by the Legislature of Virginia in 1873. Code of 1873, ch. 183, §26.

Such a lien is a right of high order, and is under the law and by force of law, a plain, direct, positive *charge* upon real estate. Having once attached, it continues, unless it is in some way discharged, as long as the real estate on which it rests remains the property of the judgment debtor. It accompanies the land in its descent to heirs, follows it into the possession of volunteers, and even into the hands of purchasers for value, if they have notice, or even if they do not have notice, *provided* the judgment is docketed in the manner and within the time prescribed by law.

It is a mistake to suppose, that the 9th section of chapter 186 of the Code of 1860, amended by section 7 of chapter 136, Code of West Virginia, was intended to create a *lien* against the purchaser by docketing the judgment. The lien is created by section 5 of ch. 139 of the Code of

West Virginia, and attaches to all the real estate of the debtor, and continues, except so far as is qualified by section 7. The qualification is, that it shall not extend to real estate aliened after judgment to purchasers for value, who had no notice of the judgment, unless the judgment be docketed in the manner and within the time prescribed. The implication is irresistible, that if so docketed it shall be a lien ; that is, that the *lien*, which was created by section 5, shall continue as to such purchasers.

In *Taylor's adm'r* v. *Spindle*, 2 Gratt. 44, in discussing the nature and extent of the judgment *lien* under the law as it then stood, and referring to the act of 1843, Stannard, J. said : "The late act of March, 1843, respecting the docketing of judgments clearly evinces, that in the opinion of the Legislature the *lien* of the judgment creditor operated from the date of the judgment, and *continued thenceforward* without qualification and impediment, while the creditor had, or could get, the capacity to issue the *elegit* on it, irrespective of intervening abatements, suspensions or delays; and that the judgments docketed *according to that act* would in like manner *preserve the past, and continue the existing lien indefinitely,* that is, until from some supervening cause it should be lost by the loss of the rightful capacity to sue out execution on the judgment."

In what I have thus far said upon the subject of the lien of judgments, I have followed substantially the language of Judge Burks in *Borst* v. *Nalle et al.*, 28 Gratt. 423.

Section 5, therefore gives to the judgment creditor a positive express lien, on all the real estate, of which the debtor at the time was possessed, or to which he was entitled; which lien by the terms of the statute *must continue,* until it is in some way actually discharged. Can it be, that it is discharged or lost, by the failure of the creditor to docket it? The docketing of the judgment does not preserve the lien nor does the failure to docket discharge the lien, as to any lands, the title to

which remained in the judgment debtor, because under 5th section the lien is created and must continue, unless in some way lost. The docketing of the judgment as we have seen, does not *create* the lien, nor can the failure to docket, as between the judgment creditor and debtor, discharge the lien. It is only where the right of a purchaser for valuable consideration without notice of the judgment intervenes, that the docketing of the judgment can have any effect upon the lien. What effect does it have? As to so much of the land, and so much only, as has been conveyed to such purchaser the liens of judgment creditors are affected.

Before the act of March, 1843, the purchaser was compelled to take the hazzard of lien of judgments upon the lands he bought. There was absolutely no protection for him. That act, protected him. That act gave the judgment debtor a *year*, in which to docket his judgment; and the present act only gives ninety days. The language of the act, as to the time within which the judgment was to be docketed, is: "Within twelve months after the rendition, or forfeiture, of such judgment, decree, bond or recognizance, or ninety days before *such* land shall have been conveyed to such purchaser." The language of the 7th section of our chapter on judgment liens is: "No judgment shall be a lien on real estate *as against a purchaser thereof* for valuable consideration, &c., unless it be docketed, &c., in the county wherein *such real estate* is, either within ninety days next after the date of the judgment, or before a *deed therefor to such purchaser* is delivered for record to the recorder."

Now the manifest intention of the Legislature was, to protect so much of the land, as such purchaser might buy, from the lien of undocketed judgments; but can it be said, that the intention of the Legislature was to destroy all the undocketed liens on the unsold land of the judgment debtor for the protection of the purchaser, because he might come to the conclusion, that there was sufficient unsold land to pay the docketed judgments, and pay his

purchase money to the judgment debtor, instead of seeing that the docketed judgments were discharged? Such was certainly not the legislative intent. The purchaser knew the lands he bought were *liable* to the discharge of the docketed judgments; he also knew, that any unsold lands of the judgment debtor were liable to any undocketed judgments against him, recovered in any county in the State, or before any justice of the peace in the State, and that such judgment creditors were entitled to have their judgments satisfied, out of such unsold land in the order of their priorities. He knew this, not because he had notice, or was bound to take notice of such judgments, but because he knew, and was bound to take notice of the law, that made such judgments liens on real estate. The purchaser had the opportunity to protect himself by requiring the vendee to procure releases on the judgment lien docket of such docketed judgments, or seeing that the purchase money was applied to their discharge.

As between the judgment creditor and debtor the law requiring the judgment to be docketed has no force or application. When a purchaser intervenes, and purchases the whole property, or a part thereof, then section 7 has great force and application, because the judgment creditor, whose judgment is undocketed has lost his lien on the land so sold; the lien is not lost further than that, because the very moment the judgment debtor acquires other land, the lien attaches thereto; and its priority is also the same. It may be, that the junior judgment has been docketed; in that case while the senior undocketed judgment lien as to that land is gone, the junior docketed judgment is still a lien on that land by virtue of the statute; and such junior judgment creditor is rewarded for his diligence, and the senior loses by his negligence or *laches.* Those sections must all be construed together, and when so construed the result must be this in a case like that before us, where the senior judgments are undocketed, the

1878
Special Term.

Renick
v.
Ludington et al.

the junior judgments docketed, and part of the land has been sold, as between the judgment creditors and the judgment debtor the docketing of the judgment is without effect, and the judgments should be audited according to their priority; when all the proceeds of the unsold lands, had. been applied, if there was not enough to satisfy the undocketed judgments, then no proceeds of the land, that had been conveyed, could be applied to them, but to only such judgment creditors in the order of their priorities, as had docketed their judgments according to law before such land was sold, or within ninety days after the date of their judgments.

We think the commissioner's report, in this cause proceeded upon the correct principle.

It is assigned as error by the counsel for appellants, "to set aside the return of satisfaction of the judgment of Michael Fleshman, so as to make it operate as a lien on the lands of Ludington to the prejudice of the purchaser of a part of the lands." As between the judgment debtor and Michael Fleshman, a judgment creditor, the lien was not discharged by the return made by the sheriff at the instance of said Fleshman, because the proof is clear and conclusive to my mind, that the agreement of Fleshman with Ludington to have the execution on said judgment returned satisfied was procured by the misrepresentation and fraud of said Ludington.

Syllabus 5.

But shall the judgment be permitted to remain as a lien against the lands of Ludington, when the effect thereof would be to require the purchasers of part of the lands to suffer to that extent, by lessening the fund, out of which the docketed judgments might be at least in part satisfied?

It is insisted in argument, that a judgment creditor, who enters satisfaction of his judgment, or causes an execution to be returned satisfied, authorizes others to treat the property of the debtor as released from the lien of the judgment; and the following case among others is cited to sustain the proposition. *Page* v. *Benson*, 22 Ill.

484.  This case fully sustains the proposition ; but the opinion is so short, that it is difficult to see upon what ground the proposition is sought to be sustained.  We are not imformed, whether the court bases its opinion upon the common law, or upon some statute of the State. We know that in many States (and we believe the statute of Illinois authorizes it) executions are levied upon lands and the lands sold thereunder.  I can very well see, where this is the case and the issuing and the levy of the execution creates the lien, that the return of the execution to the office, whence it issued, satisfied, would release the lien, so far as purchasers of the property were concerned.

I do not know what was the statute of Illinois on the subject at the date of the opinion, of which we have spoken, because I have not been able to see it ; but the Revised Statutes of Illinois 1874, ch. 77, provide, that "a judgment of a court of record shall be a lien on the real estate of the person, against whom it is obtained, situated within the county, for which the court is held, from the time the same is rendered or revived for the period of seven years, and no longer, *Provided* that there shall be no priority of the lien of one judgment over that of another rendered at the same term of the court, or on the same day in vacation.  When execution is not issued on a judgment within one year from the time the same becomes a lien, it shall thereafter cease to be a lien ; but execution may issue on such judgment at any time within seven years, and shall become a lien on such real estate from the time it shall be delivered to the sheriff, or other proper officer to be executed."

The chapter provides for selling real estate under execution.  The 34th section of said chapter provides, that "where a writ of execution is issued from a court of a county to a sheriff or other officer of another county, and levied upon any real estate in the latter county, the officer making such levy shall make a certificate thereof and file the same in the office of the recorder of his coun-

ty. Until the filing of such certificate such levy shall not take effect as against creditors, and *bona fide* purchasers without notice."

In our State we have no such provisions. The execution has nothing whatever to do with the lien on real estate, it relates exclusively to liens on personal property. Here the lien on real estate is an absolute right, declared by the statute to exist, and as between the judgment creditor and debtor has nothing to do with notice, and is not affected by it, or by the recording statutes. The lands of a purchaser were before the act of 1843 liable to satisfy the lien of the judgment, not upon any presumption, that he had notice of the judgment, for in many cases he could not have notice, but because the lien of the judgment was the grant of the law, imported by the terms of the *elegit*. *Taylor* v. *Spindle*, 2 Gratt. 44; *Leake* v. *Feryuson, Id.* 419.

Now the execution has nothing to do with the judgment lien on real estate : by force of express language of the statute the judgment operates upon *all* the real estate of the debtor, &c.

It may be, if the pleadings and proof in the cause before us showed, that the purchasers of parts of the real estate of the defendant, Ludington, had examined the record of the court before their purchase, and had found the return of the execution on the Fleshman judgment, and had been misled by it to their prejudice, that a court of equity would not permit the judgment to operate as a lien to their prejudice. This however we do not decide; but in the absence of pleadings and proof, that they were so misled, and the lien never having been in fact discharged, it is a valid and subsisting lien, and entitled to its priority, against the unsold lands of said S. C. Ludington.

It is also insisted, that the court erred in holding that the conveyance of the tract of five hundred and fifty acres of land by S. C. Ludington to A. W. Ludington, in trust for the wife of said S. C. Ludington, had been

1878
Special Term.

Renick
v.
Ludington et al.

cancelled, and in treating the said tract as unsold land. Mrs. Ludington was the party most interested in having said conveyance declared valid. Upon the pleadings and proofs, the court by a decree entered in the cause declared it valid. Whether it was properly so declared, we shall not enquire, because the commissioner sold it, and Mrs. Ludington bought it at the sale, paid a part of the purchase money and gave her bonds with security for the residue. No one excepted to the report of the sale; and the court in its decree of the 25th June, 1877, declared that the court was of opinion "that Mrs. E. T. Ludington, wife of the defendant Samuel C. Ludington, declined and refused to accept the provisions of the deed executed on the 8th day of April, 1874, by her said husband to A. W. Ludington in trust for her benefit, and became the purchaser of the four hundred and fifty acres of land in the said deed mentioned at a sale of the lands of the said Samuel C. Ludington, made under a decree of this court in this cause at its May term, 1876, the court does not deem it necessary to decide, whether or not the said deed of April 8, 1874, between the said S. C. Ludington and said A. W. Ludington, trustee for Mrs. Ludington, was made with intent to delay, hinder and defraud the creditors of Samuel C. Ludington; but the court is of the opinion, and so decides, that said tract of land must now be regarded and treated as the unsold land of said S. C. Ludington, &c."

There is nothing in the record, except the commissioner's report and the decree above referred to, to show that said deed had been set aside; the proceeding is certainly irregular; but as neither Mrs. E. T. Ludington, nor her trustee complains of the proceedings, and as it seems to me that no one else is prejudiced thereby, the decree ought not to be reversed for such irregularity. The purchasers of the other lands have no right to complain of it, as there is a larger fund thereby produced to pay the undocketed judgments.

The last error assigned is, that the court decreed that

1878
Special Term.

Renick
v.
Ludington et al.

Ludington was liable to pay one-fourth of the judgment in favor of Joel McPherson against Ludington and others, securities of John E. Lewis, late sheriff of Greenbrier county, while said Ludington should have been held liable to pay only one-eighth of said judgment.

It is true, that a creditor in order to preserve his rights against a surety, is not bound to active diligence, and if he merely remain passive, his rights are not thereby impaired. *Johnson* v. *Planters' Bank*, 4 Smed. & M. (Miss.) 165; *Sibley* v. *McAllaster*, 8 N. H. 389.

Syllabus 6.

But it is also true, that if he does not remain passive, but attempts to collect the debt, and compromises the same, and by such compromise puts it out of the power of the surety, against whom he subsequently proceeds, to be subrogated to the rights of the creditor and reimburse himself, if he paid it, the right of the creditor to proceed against the surety, is by such act destroyed.

Syllabus 7.

The creditor may, if he chooses, remain passive, and not attempt to make the debt against the principal, and proceed against the principal and surety at the same time, or if he chooses, the principal being insolvent, he may proceed against the sureties *seriatim*, and collect a proportionate part, and as long as he does nothing by way of release of such sureties, that will impair the right of other sureties, he may so proceed and will not lose his remedy against such others. But where the creditor has proceeded as in this case, to collect a debt of an insolvent principal from his eight solvent sureties, and has collected of six of them six-eighths of the debt, and had proceeded to collect another eighth from a surety, and failed to get it all, and is proceeding to collect from the last of the eight, the entire debt remaining unpaid, which would be more than the proportion that the other ought to have paid, this last surety should not be required to sustain more than his just proportion of the loss by reason of the failure to collect one-eighth from the seventh man. And if, in his attempt to collect the said eighth, he has made any compromise of the debt, by which he

had discharged that man or his estate, then his remedy against the eighth man to recover any part of such loss is gone.

McPherson proceeded to collect from the eight solvent securities of Lewis, the insolvent defaulting sheriff, one-eighth of his judgment from each. He succeeded in collecting from six of them one-eighth each. He attempted to collect from the estate of Jacob Sydenstricker, one of said sureties, an eighth; and the claim was reported in a chancery suit against said estate. It does not appear, whether McPherson released the six who had paid their portions, according to his idea; but it does appear, that on the 31st day of January, 1871, John T. and Philander T. Sydenstricker gave to Joel McPherson an order on Col. James W. Davis for one hundred and thirty-one dollars, as balance due said McPherson on execution against their father Jacob Sydenstricker, deceased, as one of the sureties of John E. Lewis, deceased, late sheriff &c., "which amount, was to be paid out of next instalment of land purchased by said Davis of the heirs and legatees of Jacob Sydenstricker." On that order is made an endorsement by James Withrow, commissioner, on the 1st day of June, 1875, that on that day Joel McPherson personally appeared before such commissioner, "and on his oath says that the amount mentioned on the other side of this paper ($131.00) is all that he claims of the heirs of Jacob Sydenstricker on account of said execution against said Jacob Sydenstricker, as one of the sureties of the late J. E. Lewis, and that this sum with interest from the 31st day of January, 1871, is still due, and when paid shall be in full of the claim reported in the case of *Mathews, trustee* v. *Sydenstricker's adm'r*, as due to him."

Afterwards on the 13th day of July, 1876, the said McPherson "took from said J. W. Davis his note of the then value of $86.84, and in consideration thereof agreed that the said order should be delivered up to said Philander Sydenstricker." This appears in the affidavit

1878
Special Term.

Renick
v.
Ludington *et al.*

of Harris, the counsel of McPherson. He says further "that said sum of $86.84 was not received, or intended to be received, in satisfaction of said judgment, nor was any release of said judgment executed either in whole, or in part, nor was any satisfaction, or release of said judgment, or any part thereof, agreed to be entered; that affiant regarded the case as settled, as to the judgment, so far as the Sydenstrickers were concerned, and hence he considered the adjustment with Davis as a practical adjustment of the whole matter, so far as the Sydenstrickers were concerned, because it contemplated a surrender of the order for cancellation; that this order was in fact, originally for much less than Jacob Sydenstricker's proportion (one-eighth) of said judgment, and was signed by two of his heirs; that McPherson himself had nothing whatever to do with the adjustment aforesaid, and knew nothing about the same until some time afterwards, when he ratified and confirmed what was done; that soon after said adjustment affiant informed the commissioners in this case thereof, and in a settlement thereof deducted the $86.84 from the amount reported against Ludington."

McPherson in his answer to Fleshman's petition, contesting the right to charge said Ludington two-eighths of said judgment, as it would be to his prejudice, admitted the facts substantially as set out in the affidavit of his counsel. Some of these facts appear in the record, or part of the record, in the case of *Mathews, trustee*, v. *Sydenstricker's adm'r*, which was exhibited with Fleshman's petition. I think it is properly a part of the record, as is the residue thereof in manuscript, brought up by agreement of counsel. I have examined the whole of that record as brought up, and I cannot resist the conclusion, that McPherson did compromise his claim against the estate of Jacob Sydenstricker, and agreed to take less than the claim by accepting the order on Davis, signed by the two Sydenstrickers, and that he surrendered that order by taking the note of Col. Davis, on whom the or-

der was drawn, and this must be taken to have been, from all the facts and circumstances in the case, a full release and discharge of his claim against the estate of Jacob Sydenstricker; and of course it would not be equitable to peimit him to recover the claim against a co-surety of said Sydenstricker.

The decree was erroneous as to the claim of said McPherson; and in so far as the decree allows one-fourth of the judgment against Lewis and his sureties to be paid out of the proceeds of the sale of Ludington's lands the same is reversed; and the appellant, S. C. Ludington, must recover of the appellee Joel McPherson his costs about his appeal expended; and the said decree is in all other respects affirmed, and this cause is remanded to the circuit court of Greenbrier county, with instructions, to ascertain, by reference to a commissioner or otherwise, what is the one-eighth of said judgment of said McPherson v. Lewis and his sureties, and the interest and damages thereon, and to decree the one-eighth of said judgment, with interest and costs, to be paid out of the proceeds of the lands of said Ludington, giving the said judgment the same place as to priority, and to be paid out of the same fund as the former decree required, and to further proceed with the case, according to the principles herein, and further according to equity.

THE OTHER JUDGES CONCURRED.

DECREE REVERSED IN PART AND AFFIRMED IN PART.

CAUSE REMANDED.